# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### at KNOXVILLE

JOHNNY RUTHERFORD,           )
                                       )

       *Petitioner*,             )
                                       )

v.                                )     No.:   3:00-cv-654
                                       )             (VARLAN/SHIRLEY)

HOWARD CARLTON, Warden,    )
                                       )

       *Respondent*.         )

## MEMORANDUM

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by

petitioner Johnny Rutherford ("Rutherford").  The matter is before the court on the motion

to dismiss and for summary judgment filed by the Attorney General for the State of

Tennessee on behalf of the respondent, and Rutherford's response thereto.  For the following

reasons, the motion to dismiss and for summary judgment [Court File No. 9] will be

**GRANTED**.  This action will be **DISMISSED WITH PREJUDICE**.  All other pending

motions will be **DENIED** as **MOOT**.


I.      Standard of Review


Under Rule 8 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES

DISTRICT COURTS, the court is to determine, after a review of the answer and the records of

the case, whether an evidentiary hearing is required.  If no hearing is required, the district

judge is to dispose of the case as justice dictates. If the record shows conclusively that Rutherford is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.    Factual Background

The Attorney General has provided the court with copies of the relevant documents pertaining to Rutherford's direct appeal and post-conviction proceedings. [Court File No. 11, Notice of Filing of Documents, Addenda 1-18]. Rutherford was convicted by a jury of aggravated rape, aggravated kidnapping, armed robbery, and escape. Because he was found to be an habitual criminal, he received concurrent life sentences for the aggravated rape and armed robbery convictions. He was sentenced to a consecutive terms of imprisonment of 40 years and three years, respectively, for the aggravated kidnapping and escape convictions. The aggravated rape, aggravated kidnapping, and armed robbery convictions were affirmed on direct appeal; the conviction for escape was reversed. *State v. Rutherford*, C.C.A. No. 176, 1988 WL 23569 (Tenn. Crim. App. March 15, 1988), *perm. app. denied, id.* (Tenn. May 31, 1988) [Addendum 8].

The Tennessee Court of Criminal Appeals summarized the evidence against Rutherford as follows:

> [A]t 2 a.m. on the day in question, the victim was working the late shift at the Git 'n Go convenience market in Clinton, Anderson County. A male entered. He presented a revolver. He had a brown and orange ski mask over his head.

He shook the gun at her and said, "You know what I want." She gave him the available money and eight $1 food stamp coupons.

Not satisfied with the money, he forced her at gunpoint to accompany him to his car parked a short distance away. After practically stuffing her into his car, he drove for about one-half hour, stopping at a deserted area. He forcibly penetrated her vaginally while threatening with anal penetration as well as fellatio. He displayed two handguns during the encounter.

On the return trip he released her; she fled to the nearest house, from which the police were called. She described the vehicle of her abductor as "dark in color", "old and large", with a "spider-web" like crack in its windshield. She told authorities that two "clutch pin keepers" fell into the seat of the car after her assailant had yanked the name tag from her smock.

A short time later, officers observed a car fitting the description and followed it. They noticed that its license plate was not plainly visible. Additionally, the car was weaving across the road. They stopped the car. The defendant, the sole occupant, was removed from the car, searched, and placed in the police vehicle. The officers recovered from defendant an amount of currency which nearly matched the denominational description of the money taken from the victim. A quick "once-over" of the vehicle yielded eight $1 food stamp coupons, a quantity of .38 caliber and .22 caliber cartridges. Two "clutch pin keepers" such as would be used to attach a name tag were found in the fold of the front seat.

The investigation continued, aided somewhat by a light dusting of snow which made the tire tracks left by the vehicle easy to follow. Along the route taken by the abductor's vehicle, Officer Humphrey recovered a flashlantern, a brown and orange ski mask, a brown paper bag, a .22 caliber pistol, a .38 caliber pistol, and a dark jacket, each of which was identified by the victim as being similar to those which she had observed the assailant wear or use on the night in question.

The victim was transported to an emergency medical facility for examination and treatment. Personnel there observed bruises and scratches on the inner portion of the victim's thighs as well as on her forehead. Also visible to them was a cut on her toe. They described her as "tearful and upset."

A fingerprint expert compared a latent print lifted from the flashlantern battery to the known prints of the defendant. He found 12 points of

3

comparison, concluding therefrom that the prints on the flashlantern battery were those of the defendant.

A forensic serologist testified that a comparison of body fluids obtained from the defendant and the victim indicated that the victim has ABO type A blood, and her body produces the A and H antigens only. On the other hand, the defendant has ABO type AB blood, and his body produces the B antigen only. His investigation found the presence of the B antigen in the victim's fluids, concluding therefrom that the B antigen in her fluids was deposited by a person with ABO type AB or B blood.

In his statement to police on February 13, defendant said that after drinking at home, he left Knoxville at about 11:00, drove to Clinton via Oak Ridge, and went to a Moore Street address to meet someone. Failing to find that person, he drove toward Lake City.

The defendant's wife testified that she was with him from 10 p.m. on the night in question until 2:00 or 2:30 the next morning. She said that the "clutch pin keepers" recovered in the car could belong to her children.

Kathy Copock, a neighbor whose trailer home is within view of defendant's trailer home testified that she saw the defendant at 2 a.m. on the morning in question.

Defendant's step-daughter, Angie Wilson, testified that she saw the defendant at 2:15 a.m. on the morning in question.

As a witness in his own behalf, the defendant swore that he left his trailer "around 2:30, sat on the side of the river for a while ... and then went from there to Lake City and that's where I got stopped." He explained that the "clutch pin keepers" probably belonged to his daughter, and that the flashlantern was in his car when it was impounded by the police.

He admitted to having seen the victim in the convenience store on prior occasions, but denied that he robbed, abducted, or raped her.

*State v. Rutherford*, 1998 WL 22569 **1-2 (footnote omitted) [Addendum 8].

Rutherford next filed a petition for post-conviction relief which, after a reversal and remand for a new evidentiary hearing after expansion of the record[1], was denied on the merits after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed. *Rutherford v. State*, No. E1999-00932-CCA-R3-PC, 2000 WL 246411 (Tenn. Crim. App. March 6, 2000), *perm. app. denied, id.* (Tenn. September 18, 2000) [Addendum 18].

In support of his habeas corpus petition, Rutherford alleges the following:

1.    The evidence was insufficient to support a finding of guilt beyond a reasonable doubt.

2.    The petitioner was denied the effective assistance of trial and appellate counsel.

3.    The prosecution withheld material exculpatory evidence.

4.    The trial court denied petitioner's request for DNA analysis to prove actual innocence.

5.    The trial court improperly denied petitioner's motion to suppress evidence obtained pursuant to an unconstitutional search and seizure.

6.    The petitioner was denied the right to a speedy trial.

7.    Illegal evidence was admitted at trial, without verification of a chain of custody or authentication by witnesses.

8.    Petitioner's Sixth Amendment right to confront the witnesses against him was violated.

9.    The "cumulative effect" of the above errors resulted in the wrongful conviction of a factually innocent man.

---

[1]*Rutherford v. State*, No. 03C01-9306-CR-00186, 1994 WL 679327 (Tenn. Crim. App. December 6, 19940 [Addendum 11].

The Attorney General contends the respondent is entitled to judgment as a matter of law based on procedural default and on the findings of the Tennessee state courts.

III.    Procedural Default

The doctrine of procedural default is an extension of the exhaustion doctrine.  A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies.  28 U.S.C. § 2254.  This rule has been interpreted by the Supreme Court as one of total exhaustion.  *Rose v. Lundy*, 455 U.S. 509 (1982).  Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court.  *Picard v. Connor*, 404 U.S. 270 (1971).  *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review.").  Moreover, the substance of the claim must have been presented as a federal constitutional claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Rutherford cannot file another state petition for post-conviction relief.  TENN. CODE ANN. § 40-30-102(a).  Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-

6

compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

Rutherford's claims that the evidence was insufficient to support the convictions and that the prosecution withheld material exculpatory evidence were never presented to the Tennessee courts, either on direct appeal or in post-conviction proceedings. Rutherford's claim that illegal evidence was admitted was presented to the Tennessee courts as a matter of state law only. As noted earlier, in order to exhaust his state court remedies for federal habeas corpus purposes, a petitioner must have presented the claim to the state courts as a matter of federal law.

> A federal court will not address a habeas petitioner's federal constitutional claim unless the petitioner has first fairly presented the claim to the state courts. Fair presentation of a federal constitutional issue to a state

7

court requires that the issue be raised by direct citation to federal cases employing constitutional analysis or to state cases relying on constitutional analysis in cases with similar fact patterns.

*Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) (citation omitted).

> The federal courts do not have jurisdiction to consider a claim in a *habeas* petition that was not "fairly presented" to the state courts. A claim may only be considered "fairly presented" if the petitioner asserted both the factual and legal basis for his claim to the state courts. This court has noted four actions a defendant can take which are significant to the determination whether a claim has been "fairly presented": (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citations omitted). Accordingly, Rutherford has defaulted his claims that the evidence was insufficient to support the convictions, that the prosecution withheld material exculpatory evidence, and that illegal evidence was admitted at trial.

Rutherford claims his procedural default should be excused because to do otherwise would result in a miscarriage of justice based upon the conviction of a factually innocent person. "Briefly stated, a fundamental miscarriage of justice occurs when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Mitchell v. Rees*, 114 F.3d 571, 579 n.12 (6th Cir. 1997) (citations omitted).

Rutherford, however, has failed to demonstrate that he is actually innocent of the crimes for which he was convicted. In fact, the record contradicts his claim of actual innocence. This matter was stayed pending the results of DNA testing by the Tennessee Bureau of Investigation, in conjunction with The Innocence Project of the Benjamin N. Cardozo School of Law and The Innocence Project at the University of Tennessee School of Law. It should be noted that Rutherford himself diligently pursued the DNA testing. The test results have been filed with the court and indicate the following: the blood found on the carpet from Rutherford's car was from the victim; the sperm obtained from the vaginal swabs from the sexual assault kit was Rutherford's. [Court File No. 25, Addendum 19].

Rutherford also seeks to excuse his default based upon ineffective assistance of counsel. Attorney error may constitute "cause" for procedural default only if it constitutes ineffective assistance of counsel in violation of the Sixth Amendment. *Coleman*, 501 U.S. at 755.

> At a minimum, then, *Wainwright v. Sykes* plainly implied that default of a constitutional claim by counsel pursuant to a trial strategy or tactical decision would, absent extraordinary circumstances, bind the habeas petitioner even if he had not personally waived that claim.

*Murray v. Carrier*, 477 U.S. 478, 485 (1986). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Id.* at 486-87.

This court has reviewed the transcript of Rutherford's trial and finds the circumstantial evidence more than sufficient to support the convictions. As defense counsel testified at the

first post-conviction evidentiary hearing, he did not raise on appeal the sufficiency of the evidence because the State's case was "circumstantially extremely strong." [Addendum 10, Transcript of the Evidence, p. 39]. In ruling that an alleged error was harmless error, if error at all, the Tennessee Court of Criminal Appeals noted the "overwhelming proof of guilt" presented at trial. *State v. Rutherford*, 1998 WL 23569 *5.

Under the circumstances, any challenge on appeal to the sufficiency of the evidence would have been frivolous. The failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel. *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990). Likewise, an attorney is not required to raise meritless issues on appeal. *Mathews v. United States*, 11 F.3d 583, 585 (6th Cir. 1993).

With respect to Rutherford's claim that illegal evidence was admitted at trial, errors in the application of state law, especially in regard to the admissibility of evidence, are not cognizable in a federal habeas corpus proceeding unless the errors result in a denial of fundamental fairness. *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). *Accord, Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). The court finds no fundamental unfairness in Rutherford's trial, and there was no reason for counsel to have challenged the evidence on any basis other than an issue of state law.

Rutherford alleges that the State's conduct excuses his procedural default as to the prosecution withholding exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He relies on *Strickler v. Greene*, 527 U.S. 280, 284 (1999), in which the court

10

found that "conduct attributable to the Commonwealth that impeded trial counsel's access to the factual basis for making a *Brady* claim" constituted cause for procedural default.

Rutherford did not identify, in his habeas corpus petition, the exculpatory evidence allegedly withheld by the prosecution, other than to refer to witness testimony that he was not the perpetrator. In his response to the respondent's motion for summary judgment, however, Rutherford refers to an "exculpatory" police report that the Git 'n Go market was robbed, two months after the robbery for which he was convicted and while he was in jail, by a lone gunman wearing a hood over his head.

This police report was referred to in the examination of a witness during the second post-conviction hearing and made an exhibit to the hearing. [Addendum 14, Transcript of Post Conviction Hearing, p. 46, Exhibit 1]. Clearly post-conviction counsel was aware of the police report and could have raised the *Brady* claim in the petition for post-conviction relief. Counsel failed to do so and thus the claim is procedurally defaulted. *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 426 (6th Cir. 2003) ("To the extent Gulertekin may assert ineffective assistance of her post-conviction counsel as cause for the procedural default of her claim for ineffective assistance of trial counsel, she is barred by the fact that she has no constitutional right to such counsel. Thus, she is unable to demonstrate cause for the procedural default of this claim.").

Rutherford has procedurally defaulted his claims that the evidence was insufficient to support the convictions, that the prosecution withheld material exculpatory, and that illegal evidence was admitted at trial. With respect to the remaining claims for relief, the Attorney

General contends the respondent is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

IV.  State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Rutherford may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Rutherford must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Rutherford has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively

unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

## V.    Discussion of Remaining Grounds for Relief

### A. *Ineffective Assistance of Counsel*

In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), the defendant must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's

13

conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

In considering Rutherford's allegations of ineffective assistance of counsel in post-conviction proceedings, the Tennessee Court of Criminal Appeals summarized the evidence at the post-conviction proceedings as follows:

> At the November 19, 1992, post-conviction evidentiary hearing, the petitioner's attorney testified that he represented the petitioner at trial and on direct appeal. He said that he met with the petitioner twenty to thirty times. He said that on four or five occasions, he discussed plea options with the petitioner. He said it was possible that only two of the meetings lasted for forty-five minutes or more, but he doubted it. He said he believed the state's case was weaker at trial than he had anticipated it would be because the victim's testimony was tentative, but the state's case remained circumstantially strong. He stated that the state had ten to fifteen pieces of circumstantial physical evidence that indicated either the petitioner or his car were present at the robbery. He said he presented an alibi defense that the petitioner had a domestic dispute with his wife at the trailer park, took a drive to cool off, and barely had time to arrive at the place where the police stopped him. He agreed that the petitioner's conviction rested on legal and constitutional issues decided in the motion to suppress evidence from the petitioner's car.

> The attorney testified that at the pretrial suppression hearing, he argued that the police did not have probable cause to stop the petitioner's car. He said that on the night of the incident, two officers stopped the petitioner, placed him in the back of the patrol car, and searched his car. He said the officers testified that they did not consider the petitioner to be under arrest at this point but that he was not free to go. He said that he tried to stress the problems with the timing of the search at the suppression hearing. He said the trial court ruled

that probable cause to stop and search existed because the officers could have charged the petitioner with driving under the influence of an intoxicant (DUI).

The attorney agreed that the affidavit supporting the search warrant for the petitioner's blood sample stated that the victim had identified the petitioner by his voice. He said that this voice identification was not substantiated by the victim's testimony at trial.

The attorney testified that fingerprints were taken from a battery inside a flashlight found by investigating officers on the morning of the crime. He stated that he did not see an enlarged photograph of the fingerprints or a comparison of the fingerprints from the battery with those of the petitioner. He said he only had the opinion of the state's fingerprint expert. He said that the expert did not bring the photographs to trial. He said he did not have funds to hire his own fingerprint expert.

The attorney testified that he did not know if a break in the chain of custody for the rape kit existed. He said he did not remember the petitioner asking him to subpoena an inmate who worked in the jail kitchen and who purportedly could testify that the rape kit was kept in the jail's refrigerator.

At the first hearing, the petitioner testified that he was incarcerated for eleven months after his arrest in this case. He said he saw his initial attorney three times before and during his preliminary hearing. The petitioner said that after his trial attorney was appointed, he spoke to his trial attorney a number of times when the attorney was at the jail visiting other inmates, but his attorney only came to see him twice. He said the state's evidence should have been used against someone else.

At the second evidentiary hearing on November 4, 1996, the petitioner's attorney testified that he did not remember if he objected specifically to the removal of the blood-stained carpet from the petitioner's car. He said he filed an objection to everything taken from the petitioner's car based upon the warrantless search of his car. He said he remembered challenging the affidavit to the search warrant for the petitioner's blood sample. He said he objected to an amendment of the escape indictment at trial, but he did not recall having any problems with the judge's instructions to the jury. He said he informed the petitioner of his habitual offender status. He said they knew the petitioner was risking a life sentence with any felony conviction. He stated that he did not ask the judge to charge any lesser included offenses because he did not want to create the possibility of a compromise verdict.

Mark Wills testified that he was a patrol officer with the Lake City Police Department in 1986. He said he did not recall having a manual on policies and procedures for stops and searches. He said he normally would notify the dispatcher when he was stopping someone, but he did not remember if he did so in the petitioner's case. He said that on the night of the incident, he stopped the petitioner's car close to the time that he received a dispatch to be on the lookout for a dark, older-model car. He agreed that the stop of the petitioner went from being a traffic stop to an investigatory stop because his focus for stopping the petitioner turned from the petitioner's license plate to the dispatch information. He said he assisted in the search of the petitioner's car after the petitioner was placed in the patrol car. He said he did not get authorization from a supervisor before searching the car. He said he thought that one of the officers searched the petitioner's trunk. He agreed that the petitioner could not have reached a weapon, destroyed any evidence, or driven away in the car during the search. He said that officers arrested the petitioner at the scene and took him to jail.

Officer Danny Humphrey of the Anderson County Sheriff's Department testified that he arrived on the scene only minutes after officers stopped the petitioner's car. He said he searched the car based upon the traffic stop and found clutch pin keepers in the crease of the front seat. He said he did not inventory the car nor did he have a search warrant. He said that he would normally search for a weapon, but he did not remember if he had been searching for one in this case. He agreed that he testified at the preliminary hearing that he was searching for evidence. He said he did not remember if the food stamps were found in the petitioner's car or shirt. He said he later found some clothing, including a ski mask, at an area called the "turkey shoot." He said he did not remember talking to the victim or giving information to Officer Scarboro to be used to obtain a search warrant for the petitioner's blood sample.

Officer Humphrey testified that he brought the tires from the petitioner's car to trial. He said that the tires were evidence and that he did not have a search warrant to remove them from the car. He said he brought the tires to court in order to compare them to photographs of tire prints. He said that his only training in identifying tire prints occurred at the police academy in 1983.

Officer Dorman Scarboro testified that he vaguely remembered investigating the kidnapping and rape of the victim on February 13, 1986. He stated that he did not recall getting the search warrant for the petitioner's blood sample. He said he did not know if the petitioner had been in the victim's

16

presence before he signed the affidavit. He said that if he had stated in the affidavit that the victim identified the petitioner as the perpetrator of the crimes, then it was true. He said he was not aware that the victim did not identify her assailant in her statements and testimony. He said he was sure that the judge who signed the search warrant had questioned him regarding the affidavit. He said he told the truth when he signed the affidavit in front of the judge.

Richard Foschino testified that in February 1986, he was a detective with the Anderson County Sheriff's Department. He said that although Lake City officers stopped the petitioner, he was in charge of the investigation. He said the Clinton Chief of Police sent him evidence in the case, which he sent to the Tennessee Bureau of Investigation (TBI), but he did not recall what type of evidence this was. He said he normally prepared the evidence for the TBI lab. He stated that he stored blood evidence and rape kits in a locked refrigerator in the kitchen at the courthouse. He said that only he, the Sheriff, and maybe another investigator had keys to the refrigerator. He said that if an inmate trustee said he saw evidence in the refrigerator, then the trustee was wrong. He said he would have been able to tell if someone had tampered with the lock.

Detective Foschino testified that he remembered the carpet being removed from the petitioner's car but that he did not remember if he removed it or watched someone else remove it. He agreed that the petitioner was in jail at the time the carpet was removed and therefore could not harm the officers or destroy the evidence. Detective Foschino said he assumed that he would have been looking for evidence in the car. He stated that he might have been taking photographs of the car. Following the evidentiary hearing, the trial court found that the petitioner failed to show either deficiency or prejudice and denied the petition for post-conviction relief.

*Rutherford v. State*, 2000 WL 246411 **3-5. This court has reviewed the transcript of the post-conviction hearings; the findings by the Tennessee Court of Criminal Appeals are supported by the record.

Rutherford has alleged nine instances of ineffective assistance of counsel, each of which are considered below.

**1. Failure to challenge the warrantless seizure of blood-stained carpet from the car**. Rutherford also claims his attorney should have questioned whether the inventory procedures of the Anderson County Sheriff's Department permitted the seizure.

Rutherford's allegation that his attorney failed to challenge the seizure of the blood-stained carpet is factually incorrect. On May 12, 1986, counsel filed a motion "to suppress all evidence seized from [Rutherford's] vehicle." [Addendum 1, Technical Record on Direct Appeal, p. 18]. The motion was denied by order entered May 29, 1986 [*id*., p. 20] after a hearing on the motion to suppress. [Addendum 5, Transcript of Motions, pp. 1-52].

The Tennessee Court of Criminal Appeals affirmed on direct appeal the denial of the motion to suppress. *State v. Rutherford*, 1988 WL 23569 *4-5. In post-conviction proceedings, where Rutherford raised the same claim he raises here, the appellate court noted that the search and seizure issue had been previously addressed on direct appeal; the court also found that Rutherford's attorney was not ineffective by failing to "explore the propriety of the impoundment." *Rutherford v. State*, 2000 WL 246411 **7-8. These findings are supported by the record and are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**2. Failure to challenge false statements in the affidavit supporting the search warrant for Rutherford's blood sample**. Rutherford alleges his attorney should have filed a pretrial motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the affidavit of Dorman Scarboro.

*Franks v. Delaware*, 438 U.S. 154 (1978), concerned the validity of a search warrant and the veracity of an affidavit supporting the warrant. The Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Id*. at 155-56. The Court further held that, if at the hearing the defendant establishes by a preponderance of the evidence that the affidavit contained a false statement that was necessary to a finding of probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id*. at 156. The Court noted, however, that "[a]llegations of negligence or innocent mistake are insufficient" to mandate an evidentiary hearing. *Id*. at 171.

The Tennessee Court of Criminal Appeals summarized Rutherford's claim of ineffective assistance of counsel on this issue as follows:

> The petitioner contends that his attorney was ineffective for not seeking the suppression of his blood sample, which he claims was obtained with a search warrant based upon an affidavit containing false statements. He asserts that the affidavit falsely states that the victim identified him by his voice in the affiant's presence, that food stamps taken in the robbery were found on his person, and that the victim could identify the food stamps as those taken in the robbery. He also argues that the use of his name in the affidavit falsely indicates that the victim identified him as the perpetrator of the crimes. He contends that the remaining statements in the affidavit do not provide probable cause to issue the warrant. The state contends that the petitioner has failed to show prejudice because a search warrant would have been forthcoming based upon the circumstantial evidence of the petitioner's guilt that the police had at the time the warrant was issued.

*Rutherford v. State*, 2000 WL 246411 *9.

After a thorough review of the court, the appellate court then determined this claim

of ineffective assistance lacked merit.

> The record reveals that the petitioner's attorney filed a motion to reconsider suppression two days before the trial. This motion included the contention that the affidavit used to obtain the search warrant for the petitioner's blood sample falsely stated that the victim identified the petitioner by voice. The trial court denied the motion on the morning of trial, finding that the motion came too late for a hearing on the matter and that no sufficient reason to suppress the evidence existed at that time.

> Our review of the victim's testimony at trial reveals that she did not mention whether she could at that time or had previously identified the petitioner by his voice. The victim was not asked at trial to identify the petitioner as the perpetrator. The preliminary hearing testimony was not officially recorded. The attorney testified at the evidentiary hearing that the petitioner's initial attorney taped the preliminary hearing and had his staff create a transcript. Even if the victim could not recognize the petitioner's voice at the preliminary hearing, this does not preclude the possibility that she was able to recognize his voice as that of her assailant at some earlier time. The petitioner has failed to show that the voice identification statement in the affidavit is false; therefore, he is not prejudiced by his attorney's failure to challenge the warrant at the suppression hearing. Furthermore, the petitioner is not prejudiced by the use of his name in the affidavit based upon the facial validity of the voice identification.

> The record supports the trial court's finding that the officers found the food stamps in the petitioner's car rather than on his person. Although the victim could not identify the food stamps from the petitioner's car as the ones from the robbery, she did testify that she gave the perpetrator eight one-dollar food stamps from the register. This matched the amount and denomination of the food stamps found in the petitioner's car. The fact that the food stamps were in the car rather than on the petitioner is not material to the issue of probable cause when the petitioner had just stepped out of the car before his arrest. The fact that the food stamps matched in number and denomination but had no other distinguishing features for the victim to identify is also immaterial. Finally, the petitioner has made no showing that Officer Scarboro intentionally misstated these facts in the affidavit. Thus, the petitioner is not prejudiced by the presence of these immaterial misstatements in the affidavit.

*Id.* at *11.

The findings of the appellate court are supported by the record. In reaching its conclusion, the appellate court noted that the standard for review was whether the affidavit contained a false statement, made with intent to deceive or recklessly made, which was essential to establish probable cause. *Id*. at *10. Thus, the court's conclusion is neither contrary to, nor did it involve an unreasonable application, of federal law under the standards established in *Franks* and *Strickland*.

**3. Failure to challenge the chain of custody of the body specimens**. Rutherford alleges his attorney should have objected to admission of the blood, saliva and vaginal samples taken from the victim, and his blood and saliva samples. The Tennessee Court of Criminal Appeals carefully considered and rejected this claim.

> The petitioner contends that his attorney was ineffective for failing to challenge the chain of custody of the rape kit and the petitioner's blood and saliva samples before trial or to preserve this issue for appeal. He argues that the record does not reveal who had possession of this evidence between February 13, 1986, and February 19, 1986. He claims that his attorney failed to subpoena an inmate trustee who could testify that he saw vials of blood, a rape kit, and other evidence stored openly in the refrigerator at the jail during this six-day period. He states that the trustee died before the post-conviction evidentiary hearing. He claims that if his attorney had raised this issue before trial, then the trial court would have suppressed the rape kit as well as his blood and saliva samples. The state contends that the record reveals that the evidentiary specimens were properly delivered to the TBI laboratory for testing. It also argues that even if the attorney should have challenged the chain of custody, his failure to do so is harmless in light of the overwhelming evidence of the petitioner's guilt.

> The trial court found that both Deputy Edwin Kelly and Detective Richard Foschino delivered or mailed specimens to the TBI laboratory. It found that no evidence existed that someone tampered with the specimens in question. In the direct appeal, the petitioner's attorney argued that the state did

21

not prove the chain of custody of a blood specimen, but the court could not review the matter because it could not determine which specimen was at issue.

At trial, Officer Dorman Scarboro testified that he gave blood and saliva samples taken from the petitioner to Detective Richard Foschino. Detective Foschino testified that he received the rape kit from Officer Penny Baker on February 13 and that he prepared it for the TBI laboratory. He said he received the petitioner's blood and saliva specimens from Officer Scarboro and prepared them for the TBI laboratory.

At the second evidentiary hearing, Detective Foschino testified that he sent some of the evidence from this case to the TBI laboratory, although he did not recall what type of evidence it was. He said that he normally prepared the evidence for the TBI laboratory and that he stored blood evidence and rape kits in a locked refrigerator in the kitchen at the courthouse. He said that he was one of three officers with a key to this refrigerator. He stated that presumably, he would have been able to tell if someone had tampered with the lock. He said that if an inmate trustee said that he saw evidence in the refrigerator, then the trustee was wrong. The petitioner's attorney testified that he did not remember the petitioner asking him to subpoena an inmate who worked in the jail kitchen who could supposedly testify that the rape kit was kept in the jail's refrigerator.

The record does not reflect a break in the chain of custody of the rape kit or the petitioner's blood and saliva samples, nor does it reflect that someone had tampered with these items. The proof of the identity of physical evidence does not have to exclude all possibility of tampering. Instead, the "circumstances need only establish reasonable assurance of the identity" of the evidence. The petitioner does not allege that the trustee claimed to have seen the particular rape kit and specimens from this case in a refrigerator at the jail. The petitioner has failed to show prejudice.

*Rutherford v. State*, 2000 WL 246411 *11-12 (citations omitted) (quoting *Ritter v. State*, 3

Tenn. Crim. App. 372, 378, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970) (internal

quotations omitted)).

The findings of the state courts are supported by the record; the courts' conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**4. Failure to object to improper judicial conduct**. Rutherford did not identify in his habeas corpus petition the judicial conduct alleged to be improper, and he did not refer to this issue in his response to the motion for summary judgment. In his state post-conviction proceedings, Rutherford alleged his attorney should have objected to the trial court's commenting on the evidence and questioning the witnesses. The Tennessee Court of Criminal Appeals rejected the claim.

> A trial court may ask questions of witnesses in order to clarify obscure points in the testimony or to supply omissions in the interest of justice. The trial court found that at the convicting trial, it questioned the victim in order to clarify certain points in her testimony because, despite numerous admonitions to speak up, she spoke too softly for the jury to hear her at times. Our review of the victim's testimony does not show otherwise. The trial court's questions and comments at the petitioner's trial were not improper. Therefore, the attorney's lack of objection was neither deficient nor improperly prejudicial.

*Rutherford v. State*, 2000 WL 246411 *12.

The appellate court's findings are supported by the record; the court's conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**5. Failure to request jury instructions of lesser included offenses and the definition of "intentionally" and "knowingly."** Rutherford raised this issue in post-conviction proceedings. The Tennessee Court of Criminal Appeals noted that "[t]he trial

23

court has a duty to charge the jury on all lesser included offenses included in the indictment even if the defendant does not request it." *Rutherford v. State*, 2000 WL 246411 *14. They court found, however, that the evidence "did not warrant instruction on the lesser included offenses of rape and kidnapping." *Id.* at 14.

> At his trial, the petitioner denied robbing, abducting, or raping the victim. The victim testified that her assailant forced her from the convenience store and into his car at gunpoint. She stated that although he kept the gun in his pocket while he raped her, he reached for the gun to threaten her immediately preceding the rape when she refused to cooperate. Officer Danny Humphrey testified that he found two guns at the turkey shoot in a paper bag in a pile of clothing, which included a ski mask. He stated that he found a flashlight three or four feet away. The petitioner argues that because the guns were not found on his person, the jury could have disregarded the victim's uncorroborated testimony that her assailant used a gun. The fact that Officer Humphrey found the guns abandoned with other physical evidence from the crime does not reasonably support the inference that a weapon was not used in the offenses. The petitioner has failed to point to any evidence that could support an instruction on the lesser included offenses.

> The petitioner's trial attorney noted that the petitioner consistently maintained his innocence. The attorney testified that he did not ask the judge to charge any lesser included offenses because he did not want to create the possibility of a compromise verdict. The petitioner presents no argument as to how he was prejudiced by his attorney's failure to request the trial court to instruct the jury on the definitions of "knowingly" and "intentionally." The petitioner has failed to show both deficiency and prejudice.

*Id.*

The appellate court's findings are supported by the record; the court's conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**6. Failure to object to jury instructions that no two sets of fingerprints are alike**. According to Rutherford, the instruction had the effect of directing a partial verdict for the State on the issue of identity, was an unwarranted comment on the evidence, focused the jury on one isolated fact, and relieved the State of its burden of proof.

Rutherford raised this issue in post-conviction proceedings. The Tennessee Court of Criminal Appeals found that "the trial court's instruction to the jury that no two sets of fingerprints are alike is a statement of fact that improperly intrudes upon the province of the jury." *Rutherford v. State*, 2000 WL 246411 *15. This determination was based upon article six, section nine of the Tennessee Constitution, which provides: "The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."

The court nevertheless concluded that Rutherford was not entitled to relief:

> At the petitioner's trial, Donald R. Hampton, a latent fingerprint examiner from the Tennessee Bureau of Investigation, testified that he identified a fingerprint found on the flashlight battery as that of the petitioner. He stated that his identification contained no margin of error. He testified without contradiction that no two people, including identical twins, have the same fingerprints. In considering this testimony and the remaining evidence that connected the petitioner to the crime, we conclude that the petitioner has failed to show that he was prejudiced by the trial court's instruction.

*Id*. at *16.

In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court emphasized that "the fact that the [jury] instruction was allegedly incorrect under state law is not a basis for habeas relief. *Id*. at 71-72. "The only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id*. at 72 (quoting

*Cupp v. Naughten*, 414 U.S. 141 (1973). The Court further noted that the jury instruction "must be considered in the context of the instructions as a whole and the trial record." *Id*.

Under this standard, the conclusion of the Tennessee Supreme Court that Rutherford was not entitled to relief on this claim was neither contrary to, nor did it involve an unreasonable application, of federal law. As noted earlier, the evidence of guilt was overwhelming. The trial court properly instructed the jury on the State's burden of proof and Rutherford's presumption of innocence. [Addendum 4, Transcript of the Evidence, Volume 3, pp. 372-374].

**7. Failure to argue the search and seizure issue effectively during trial and on appeal**. Rutherford alleges his appellate counsel ignored four Fourth Amendment issues: (1) the stop of his vehicle was illegal because it was pretextual, (2) the stop exceeded its rationale, (3) the search of the passenger compartment was unlawful, and (4) there was no probable cause for the stop.

As noted earlier, trial counsel filed a motion to suppress, which was denied. On direct appeal, counsel challenged the trial court's failure to suppress evidence. The Tennessee Court of Criminal Appeals concluded there was probable cause to stop Rutherford's vehicle, and that both the search at the time of the stop and at the impound lot were proper. *State v. Rutherford*, 1988 WL 23569 *4.

In post-conviction proceedings, Rutherford challenged his attorney's effectiveness on the search and seizure issue. The appellate court rejected the claim:

The validity of the warrantless search of the petitioner's car was previously determined on direct appeal. This court held that the petitioner was arrested at the time he was detained in the back of the patrol car and that the warrantless search was a search incident to arrest. The attorney challenged the search of the petitioner's car in a pretrial suppression hearing, renewed his motion to suppress on the morning of trial, and raised the suppression issue on appeal. No deficiency or prejudice exists.

*Rutherford v. State*, 2000 WL 246411 *16.

The appellate court's findings are supported by the record; the court's conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**8. Failure to challenge Officer Humphrey's testimony regarding tire prints during trial and on appeal**. According to Rutherford, Officer Humphrey was not qualified as an expert in tire print evidence, and should not have been allowed to give his opinion that the tires on Rutherford's car made the tire prints at the rape scene.

During the trial, counsel did in fact object to Officer Humphrey comparing the tire tracks found at the rape scene with the tire tracks found where the physical evidence was recovered; the objection was overruled. [Addendum 3, Transcript of the Evidence, Volume 2, p. 155]. The trial court sustained the objection to Officer Humphrey comparing the tire tracks to the actual tires on Rutherford's vehicle. [*Id*. at 164].

In post-conviction proceedings, the Tennessee Court of Criminal Appeals rejected the allegation of ineffective assistance on this issue.

At trial, Officer Danny Humphrey testified that on the night of the offenses, he observed tire prints in the snow on the road through Foust Cemetery and also on the road by the turkey shoot. Officer Humphrey identified photographs

27

of these tire prints. The trial court overruled the attorney's objection to Officer Humphrey's testimony that the tire prints at the cemetery and those at the turkey shoot appeared to be the same. The attorney objected to the state's request that Officer Humphrey compare the tire prints to the tires from the petitioner's car because the state had not qualified the officer as an expert. The trial court sustained this objection. The petitioner contends that his attorney should have challenged the tire print evidence in a pretrial motion and on appeal. The petitioner has failed to show that he was prejudiced because Officer Humphrey's testimony was limited to what he observed.

*Rutherford v. State*, 2000 WL 246411 *16

The appellate court's findings are supported by the record; the court's conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

**9. Failure to object to jury instructions that amended the indictment counts on aggravated rape, aggravated kidnapping, and aggravated robbery**. Rutherford alleges that the jury instructions (1) broadened the charge of aggravated rape contained in the indictment to allow conviction if he caused personal injury to the victim, (2) broadened the charge of aggravated kidnapping contained in the indictment to allow conviction if the victim was the victim of a felony committed while she was being held, and (3) broadened the charge of aggravated robbery contained in the indictment to allow conviction if he took property intending to permanently deprive the victim of the property.

In post-conviction proceedings, Rutherford alleged only that trial counsel was ineffective by failing to object to a constructive amendment to the indictment on aggravated rape. [Addendum 15, Brief of Appellant, p. 18]. Thus, he has procedurally defaulted his claims of constructive amendment of the indictment on the aggravated kidnapping and

aggravate robbery charges. Rutherford seeks to excuse his default based upon ineffective assistance of counsel. As the court has noted earlier, however, alleged ineffective assistance of post-conviction counsel cannot constitute cause for a procedural default.

The indictment against Rutherford for aggravated rape charged, in pertinent part, that he did "unlawfully and feloniously engage in sexual penetration of [the victim], by use of fear and coercion and by use of a deadly weapon, to wit: a gun." [Addendum 1, Technical Record on Direct Appeal, p. 8]. In the jury instruction, the trial court charged as follows:

AGGRAVATED RAPE: Any person who commits the offense of aggravated rape is guilty of a felony.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt, the existence of two essential elements:

(1) that the defendant had (unlawful) sexual penetration of the alleged victim; and

(2) that: (a) force or coercion was used to accomplish the act, and the defendant was armed with a weapon or any article used or fashioned in a manner to lead the alleged victim reasonably to believe it to be a weapon; or

(b) the defendant caused personal injury to the alleged victim; and force or coercion was used to accomplish the act.

[Addendum 4, Transcript of the Evidence, Volume 3, pp. 363-64].

Rutherford alleges that the court's "constructive amendment" of the indictment violated his due process right to notice of the charges against him. He relies on *Lucas v. O'Dea*, 179 F.3d 412 (6th Cir. 1999) in support of his claim. In *Lucas*, the Sixth Circuit noted that "[a] modification at trial that acts to broaden the charge contained in an indictment

29

constitutes reversible error." *Id.* at 416 (citing *Stirone v. United States*, 361 U.S. 212, 217-19 (1960)).

The *Lucas* court discussed the difference between an amendment to an indictment, which "'occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them'" and a variance, which "'occurs when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" *Id.* at 416-17 (quoting *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)). Thus, a jury instruction that alters the charging terms of the indictment constitutes a "constructive indictment." *Id.* at 417. "A change from the indictment material enough to result in a constructive amendment is also called a 'fatal variance.'" *Id.*

In *Lucas*, the defendant "was charged with intentional murder, but the jury instructions permitted conviction for wanton murder." *Id.* "In *Ford*, the indictment charged the defendant with possession of a firearm on or around a certain date, but the court gave a jury instruction permitting conviction if the jury found that he possess the firearm over a one-year period." *Id.* In both these cases, the variance was found "sufficiently material to constitute a constructive amendment." *Id.* As a result, both defendants were granted habeas corpus relief because they were exposed to charges for which they had no notice and no opportunity to form a defense.

The Sixth Circuit has also noted, however, that "[a] variance is not material, or does not rise to the level of a constructive amendment, unless the variance misleads the accused

in making her defense or exposes her to the danger of double jeopardy." *Martin v. Kassulke*, 970 F.2d 1539, 1543 (6th Cir. 1992). In *Martin*, defendant Rita Martin and her co-defendants James Hall and Jesse Jameson were indicted by the State of Kentucky for first-degree assault, first-degree robbery, and first-degree rape; Jameson was found guilty of first-degree rape; Martin and Hall were found guilty of aiding and assisting Jameson in the first-degree rape. *Id*. at 1540.

The indictment for first-degree rape charged that the defendants committed the offense "by knowingly and unlawfully engaging in sexual intercourse with [the victim] by forcible compulsion and further causing said [victim] serious physical injury." *Id*. at 1542. The charge instructed the jury that Jameson was guilty of first-degree rape if the jury believed "a) That ... he engaged in sexual intercourse with [the victim], AND b) That he did so by forcible compulsion, OR That [the victim] was incapable of consent because she was physically helpless." *Id*. (capitalization in original).

The Sixth Circuit reversed the grant of habeas relief, holding that the variance between the indictment and the jury instruction, which added the "physical helplessness" theory of rape, was not material. The basis for the court's holding was that there was only one crime, rape, against which the defendants were required to defend, and forcible compulsion and physical helplessness were "merely two alternative methods by which the one crime, rape, could have been committed." *Id*. at 1543.

> Nor can Jameson contend that the instruction prevented him from presenting a full defense. Jameson never denied having sex with the victim, but stated that she was a "willing participant" in whatever sex occurred.

Martin's statements corroborated this defense, which was evidently rejected by the jury. Jameson's specific comment that the victim willingly participated in sex with him clearly negates any possibility that he staked his defense on the notion that the victim was physically helpless and that her helplessness meant that he was not guilty of the crime with which he was charged.

Thus, it is in no way unfair to convict Jameson, and Martin along with him, even if it was for a rape committed when the victim was unconscious as a result of the savage beating testified to in this case. In fact, this result could not even be considered theoretically unfair; prejudicial error cannot rest on a speculative assumption that the defendants may have presented a different defense (which would make their actual defense perjurious) if they had known of the final jury instruction. Furthermore, there is no possibility that the jury could have convicted Jameson on the grounds that the victim was physically helpless, unless it also concluded that the fists and feet of the defendants caused her helplessness. By his statements regarding the victim's willing participation, Jameson asserted that the victim was not physically helpless. Thus, Martin cannot now argue that the jury instruction prejudiced Jameson's defense; Jameson's statements, if believed, represented a full defense to the claim that the victim was physically helpless.

*Id*. at 1546-47.

Rutherford's case is similar to that in *Martin*. Rutherford was charged with aggravated rape, which included unlawful sexual penetration by the use of force or coercion, and in which the defendant was armed with a weapon *or* the defendant caused personal injury to the victim. Rutherford steadfastly denied any involvement in the rape, kidnapping, or robbery; his defense was mistaken identity. Under these circumstances, his defense was not prejudiced by the court's instruction on aggravated rape.

The Tennessee Court of Criminal Appeals considered the issue in post-conviction proceedings:

The petitioner contends that his attorney provided ineffective assistance by failing to object to the jury instruction on aggravated rape. He argues that

when the trial court instructed the jury that aggravated rape could be proven if a deadly weapon were used or if the victim suffered personal injury, it constructively amended the indictment, which charged the use of a deadly weapon. The state contends that the attorney had no basis to object because the trial court properly instructed the jury on the relevant law.

...

In the present case, the jury returned a general verdict of guilty for the aggravated rape. Generally, we will affirm a general verdict of guilt if the indictment contains at least one proper count supported by the proof. The petitioner has failed to show that the trial court's instruction on the alternate theory of personal injury prejudiced him by affecting the outcome of the case. The trial court properly denied the petition on this ground.

*Rutherford v. State*, 2000 WL 246411 **13-14.

The appellate court's findings are supported by the record; the court's conclusions are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Strickland*.

## B. Request for DNA Analysis

Rutherford filed a motion, in post-conviction proceedings, for expert forensic services to perform DNA analysis in order to demonstrate his actual innocence. The request was denied and the Tennessee Court of Criminal Appeals affirmed. *Rutherford v. State*, 2000 WL 246411 *18 ("the trial court properly denied the petitioner's request for funds for expert services"). Rutherford now claims the denial of his request violated his rights to due process and equal protection. Because he is challenging a decision by the state court in post-conviction proceedings, however, Rutherford does not state a claim for federal habeas corpus relief.

33

Section 2254 only authorizes federal courts to review the constitutionality of a state criminal conviction, not infirmities in a state post-conviction relief proceeding. Because there is no federal constitutional requirement that states provide a means of post-conviction review of state convictions, an infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition.

*Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir. 1990) (citations omitted). *See also Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986); *Williams v. State of Missouri*, 640 F.2d 140, 143 (8th Cir. 1981).

In any event, as the court has noted, DNA analysis has been performed and the results contradict Rutherford's claim of actual innocence. Accordingly, Rutherford is not entitled to habeas corpus relief on this claim.

### C. Motion to Suppress Evidence

Rutherford alleges the trial court improperly denied his motion to suppress evidence obtained pursuant to an unconstitutional arrest and seizure. In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. The basis for that ruling is that, although "[t]he exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment," *id.* at 482, "the rule is not a personal constitutional right." *Id.* at

486. *Accord, Kuhlmann v. Wilson*, 477 U.S. 436, 446 (1986); *Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986).

It is clear, after a review of the record, that Rutherford's Fourth Amendment claims were fully and fairly litigated in the Tennessee courts. Accordingly, he is not entitled to habeas corpus relief on his claim that he was subjected to an illegal search and seizure.

### D. Speedy Trial

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court held that a defendant's Sixth Amendment right to a speedy trial was not violated, even though more than five years elapsed between his arrest and trial. In doing so, the Court adopted a balancing test, "in which the conduct of both the prosecution and the defendant are weighed." *Id*. at 530.

> A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id*. This test was adopted by the Tennessee Supreme Court in *State v. Bishop*, 493 S.W.2d 81, 83-84 (Tenn. 1973).

Rutherford was arrested on February 13, 1986, indicted on March 18, 1986, and arraigned on April 8, 1986. On May 6, 1986, Rutherford filed a motion for speedy trial. The trial, which was originally set for August 26, 1986, was continued until December 4, 1986, on motion of the State. Rutherford alleged on direct appeal, and now in this court, that the

delay violated his constitutional right to a speedy trial. The Tennessee Court of Criminal Appeals disagreed:

> The interval between May 12 and trial in the three severe cases involving the victim ... is not such as would trigger an inquiry as per *Bishop v. State*, 493 S.W.2d 81 (Tenn.1973).
>
> Since the record does not convey to us any indication of the manner in which defendant considers himself prejudiced by the "delay", and because the trial court made no ruling on the motion, we interpret the speedy trial matter as more in the nature of a demand or notice than as an assignment of error.
>
> Moreover, much of the time lag between motion and trial is attributable to the defendant.
>
> Nonetheless, we are not unduly troubled by an interim of approximately eight months between indictment and trial in this case. Such an interim will not alone support allegations of lack of speedy trial, in light of all the facts and circumstances.

*State v. Rutherford*, 1988 WL 23569 *4.

Given the seriousness of the charges against Rutherford, the findings of the Tennessee Court of Criminal Appeals, that Rutherford's right to a speedy trial was not violated, are supported by the record and were neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Barker v. Wingo*.

### E. Hearsay and Confrontation Clause

Rutherford alleges his Sixth Amendment right to confront the witnesses against him was violated by the State's eliciting hearsay testimony from a police officer regarding the

victim's identification of his automobile. The Tennessee Court of Criminal Appeals considered this issue on direct appeal:

> The defendant says that the state elicited hearsay testimony from Officer Massengill regarding the victim's identification of defendant's vehicle at the tow-in lot. The trial judge sustained defendant's objection to the first such effort on the grounds that it stated a conclusion. The jury was promptly instructed to disregard the testimony.
>
> Unsatisfied with this, the assistant district attorney general once again, by asking the question in a different way, elicited from the witness a description of the victim's "reaction" when she approached the defendant's car in the impound lot. This was a form of "non-verbal" conduct, but a hearsay statement nonetheless. A prompt objection brought a swift admonition from the trial judge to the jury to disregard the testimony. The trial judge also appropriately explained to the jury the reason for his ruling.
>
> Still unsatisfied, the assistant district attorney general then set the stage for the witness to answer: "[A]fter she opened the car door she started crying." We are appalled by this determined effort by the state to elicit inadmissible testimony. Why the state would choose to hazard a case of this severity in which the other available evidence of guilt was staggering defies explanation.
>
> Suffice it to say that the overwhelming proof of guilt in this case convinces us that this is harmless error, beyond a reasonable doubt, if error at all.

*State v. Rutherford*, 1988 WL 23569 *5 (citations omitted) (footnote omitted).

This is essentially the test that a federal district court must apply in considering whether to grant habeas relief based on unconstitutional trial error: whether the alleged error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The weight of the State's evidence of guilt is a factor to be considered. *Id*. at 639.

As the appellate court and this court have both noted, the circumstantial evidence of guilt against Rutherford was overwhelming. Under the circumstances, this court finds that the alleged error did not have a substantial and injurious effect on the jury's verdict. The state court's findings in that regard are supported in the record and are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Brecht*.

Likewise, as noted earlier, Rutherford cannot demonstrate that his conviction represents a fundamental miscarriage of justice. *Mitchell v. Rees*, 114 F.3d 571, 579 n.12 (6th Cir. 1997) ("Briefly stated, a fundamental miscarriage of justice occurs when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent.") (citations omitted).

### F. Cumulative Effect

Rutherford claims that the cumulative effect of the alleged errors resulted in the wrongful conviction of a factually innocent man. The Sixth Circuit has held that, regardless of whether each of a petitioner's alleged errors, standing alone, would require a finding of deprivation of due process, a court may look to whether the cumulative effect of the errors was such that the petitioner was denied fundamental fairness. *See, e.g., Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

This presupposes, of course, that there was error during the criminal proceedings. Since Rutherford's allegations of error lack merit, a cumulative error analysis is not

appropriate. *See Derden v. McNeel*, 978 F.2d 1453 (5th Cir.1992) (*en banc*). "[A]ny cumulative error theory must refer only to errors committed in the state trial court. A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors." *Id.* at 1458. *See also United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.1990) ("cumulative-error analysis should evaluate only the effect of matter determined to be in error, not the cumulative effect of non-errors."). In addition, as previously noted, Rutherford is not a factually innocent man; DNA testing proves otherwise.

VI.     Conclusion

Petitioner Rutherford is not entitled to habeas corpus relief and for that reason the respondent's motion for summary judgment will be **GRANTED**. Rutherford having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c). The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the FEDERAL RULES OF APPELLATE PROCEDURE.

     **AN APPROPRIATE ORDER WILL ENTER.**


                                        s/ Thomas A. Varlan
                                        UNITED STATES DISTRICT JUDGE